**STATE of Missouri, Respondent,**

v.

**Daniel B. WADLOW, Appellant.**

**No. SD 31448.**

Missouri Court of Appeals,
Southern District,
Division Two.

July 11, 2012.

Rosalynn Koch, Columbia, for Appellant.

Chris Koster, Atty. Gen. and Karen L. Kramer, Asst. Atty. Gen., Jefferson City, for Respondent.

ROBERT S. BARNEY, Judge.

Daniel B. Wadlow ("Appellant") appeals his conviction following a jury trial for one count of the unclassified felony of statutory sodomy in the first degree, a violation of section 566.062.[1] The trial court sentenced Appellant to life in the Missouri Department of Corrections. In his two points relied on Appellant urges the trial court plainly erred in admitting certain testimony relating to out-of-court statements made by his victim and in failing to *sua sponte* "intervene and admonish the jury" when certain testimony was elicited from a witness.

Viewing the evidence in the light most favorable to the jury's verdict, *State v. Celis–Garcia*, 344 S.W.3d 150, 152 (Mo. banc 2011), the record reveals Appellant is the paternal grandfather of B.W. ("Victim"), who was five years old at the time of this particular incident. On February 20, 2009, Victim, who was attending Head Start in Ironton, Missouri, complained to Gloria Miller ("Ms. Miller") that her "peepee"[2] hurt. When Ms. Miller asked Victim if anyone had touched her there, Victim disclosed that "Papa Dan," Victim's name for Appellant, had touched her vaginal area the previous night. She demonstrated to Ms. Miller how he had touched her with his fingers and she related that he had told her that he loved her while he was doing it. Victim told Ms. Miller it made her angry. Ms. Miller then made a hotline call and Nancy Weiss ("Ms. Weiss"), an investigator for the Iron County Children's Division, was assigned to the case.

Ms. Weiss spoke with Ms. Miller and Ms. Weiss then interviewed Victim. After speaking with Victim about various body parts, Ms. Weiss asked Victim if anyone had ever touched her any place that should not be touched and she indicated Appellant had touched her "inside [her] peepee." At that time Victim also told Ms. Weiss that another child, Travis, had thrown a bundle of rocks at her on the playground and the rocks had hit her in the genital area.[3] Victim also mentioned something about a cousin's brother touching her, but Ms. Weiss could not understand what she was saying. As a result of the interview, Ms. Weiss arranged for Victim to be interviewed at the Child Advocacy Center ("CAC") in DeSoto.

On February 20, 2009, Victim was interviewed at the CAC by forensic interviewer Connilee Boehne ("Ms. Boehne"). Victim disclosed to Ms. Boehne that Appellant had touched inside her vagina with his fingers. She related that it hurt and that she told Appellant to leave her alone. Victim explained that it happened in the living room at her father's house while she was sleeping on the floor and Appellant was sleeping on the couch. She also told Ms. Boehne that Appellant touched her vagina on the outside of her clothes. Victim used anatomically correct dolls to demonstrate how and where Appellant touched her. She also stated that it had happened on another occasion in her bedroom and one time while she was outside with Appellant. Further, Victim also suggested that Travis, the child that allegedly threw rocks at her, had touched her vagina and that she had witnessed Appellant touching her

---

1. All statutory references are to RSMo 2000.

2. This is apparently a reference to the inside of Victim's vagina.

3. The staff at Head Start reported not knowing anything about an incident between Victim and Travis.

cousin's vagina with his fingers. Ms. Boehne felt Victim was authentic in her story, had not been coached, and was not "fantasizing" in her recitation of events.

A SAFE exam was then performed on Victim on February 25, 2009. Dr. David Stansfield ("Dr. Stansfield"), who performed the exam, reported Victim had a small, quarter of an inch tear in her labia minora, some redness at the opening of her vagina, and that her hymen was "somewhat thinned more than average" with it being "nearly absent at the 7 o'clock position." These findings were consistent with sexual abuse and Dr. Stansfield felt that the "severely attenuated" hymen "likely represent[ed] abuse."

On September 14, 2009, a second CAC interview of Victim was conducted by Ms. Boehne. Victim had been brought to the CAC due to allegations that someone had been coercing Victim not to cooperate. Her statements relating to Appellant were consistent with her first interview. She then told Ms. Boehne that her paternal grandmother had tried to tape record her saying Appellant did not touch her inappropriately because her grandmother was mad about the allegations against Appellant. Victim did not recant her story despite her grandmother's protestations.

In October of 2009, Victim began seeing a professional counselor, Nancy Daugherty ("Ms. Daugherty"), because she was experiencing problems with bedwetting, nightmares and hiding in her closet. Victim consistently told Ms. Daugherty that Appellant touched inside her vagina with his fingers.[4] Ms. Daugherty believed Victim's symptoms were consistent with post-traumatic stress disorder and felt Victim was "sincerely and genuinely confused and unhappy and not understanding why he did

these things to her." However, at her counseling session on November 9, 2009, Victim told Ms. Daugherty, "You can't understand me, [Appellant] did not touch my peepee, mama did. The devil made me say that, not Jesus." She repeated the exact same phrase to Ms. Daugherty later in the session. Ms. Daugherty found this statement to be "totally inconsistent" with Victim's previous statements, non-responsive to the question she had posed, and "totally out of character for [Victim]." Suspecting Victim had been coached to say Appellant did not touch her, Ms. Daugherty had Victim's parents come into the room and asked Victim to repeat what she had told Ms. Daugherty. She repeated the same phrase as before and Ms. Daugherty told her she was confused because this was different than her previous statements about Appellant. Victim ultimately began to cry, got into her father's lap, and then stated that Appellant had, in fact, touched her vagina. She then admitted she made the other statements because she was afraid to tell the truth and did not want her father to be mad at her.

There was further evidence that several months later Victim saw Appellant at a local store and became incredibly upset and started stuttering and pointing at the mere sight of him. Around the same time, Victim saw Appellant visiting the house next door and she refused to get out of the car until Appellant went away.

Appellant was then charged with one count of first degree statutory sodomy and a section 491.075 hearing was held. Following the hearing, the trial court ruled the statements Victim made to Ms. Daugherty, Ms. Weiss, Ms. Boehne and Ms. Mil-

---

4. She later disclosed to Ms. Daugherty that Appellant also touched her on top of her clothes.

ler would be admissible if Victim testified at trial.

A jury trial was held on March 30, 2011. Victim testified briefly at trial regarding the fact that she had not lied to anyone about what had happened to her, but she offered no substantive testimony on the specific acts at issue. Appellant did not testify. At the close of all the evidence the jury found Appellant guilty of the crime charged and he was sentenced as set out above. This appeal followed.

Appellant has not properly preserved his points for appellate review and, therefore, requests plain error review under Rule 30.20.[5] Plain error review is used sparingly and is limited to those cases where there is a clear demonstration of manifest injustice or miscarriage of justice. *State v. Gaines,* 342 S.W.3d 390, 398 (Mo. App.2011). Claims of plain error are reviewed "under a two-prong standard." *State v. Roper,* 136 S.W.3d 891, 900 (Mo. App.2004). "In the first prong, we determine whether there is, indeed, plain error, which is error that is 'evident, obvious, and clear.'" *Id.* (quoting *State v. Scurlock,* 998 S.W.2d 578, 586 (Mo.App.1999)). "If so, then we look to the second prong of the analysis, which considers whether a manifest injustice or miscarriage of justice has, indeed, occurred as a result of the error." *Id.* "A criminal defendant seeking plain error review bears the burden of showing that plain error occurred and that it resulted in a manifest injustice or miscarriage of justice." *Id.* "The outcome of plain error review depends heavily on the specific facts and circumstances of each case." *Id.*

■ In his first point relied on Appellant asserts the trial court plainly erred in admitting the testimony of Ms. Miller, Ms. Daugherty, Ms. Boehne, and Ms. Weiss as to Victim's out-of-court statements to them

and in admitting the videotape of Ms. Boehne's interview with Victim at the CAC. Appellant maintains the aforementioned evidence was "inadmissible as substantive evidence pursuant to [section] 491.075" and the admission violated his constitutional rights. He argues that "the time, content and circumstances of [Victim's] statements provided insufficient indicia of reliability ... and the admission of the out-of-court statements resulted in prejudice to [A]ppellant, since absent this evidence, there is a reasonable probability that the outcome of his trial would have been different."

Section 491.075.1 provides:

[a] statement made by a child under the age of fourteen relating to an offense under chapter 565, 566, 568 or 573 ... performed with or on a child by another, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings in the courts of this state as substantive evidence to prove the truth of the matter asserted if:

(1) The court finds, in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(2)(a) The child testifies at the proceedings....

Here, at the section 491.075 hearing, Ms. Miller testified that she had a master's degree in counseling; was a licensed professional counselor; was a registered play therapist; had a great deal of continuing education training in dealing with children; and specifically had been through training relating to the disclosures of children who had been sexually abused. She related that she used the aforementioned training when she spoke with Victim and was careful not to "lead [her]" or "plant ideas in

---

**5.** All rule references are to Missouri Court Rules (2011).

[her] head." She testified that after Victim reported to her Head Start teacher that her "peepee hurt[ ]" Ms. Miller met with Victim and asked Victim "to tell [her] about ..." her discomfort. Victim then replied that Appellant "had touched her pee-pee." Ms. Miller testified that Victim then

> showed ... the motion that he made and put her hands basically between her legs and moved toward her pee-pee and indicated that she was at his house when it happened. She told ... where at his house [it happened] and ... she said he said I love you....

Victim then distinctively indicated that Appellant touched her with his fingers and stated that he had tried to touch her a second time that morning but she said "no to him." She also admitted to being mad at Appellant for his actions. This conversation took place the day following the incident at issue.

Ms. Weiss testified that as an investigator for the Children's Division she had a bachelor's degree with a specialty in early childhood education; she had completed her master's degree; and she had been through significant training in how to deal with child victims of sexual abuse. She related that she responded to the hotline call placed by Ms. Miller the same day it was received such that she interviewed Victim the day following the incident with Appellant. After spending some time "rapport building" and "get[ting] to know [Victim] a little bit," Ms. Weiss had Victim identify body parts on an anatomical drawing.

> When she named the body parts [Ms. Weiss] asked if anybody has ever touched those body parts.... [Victim] had identified the pee-pee as the vaginal area and ... she said it was not okay to touch that area. [Victim] also stated when [Ms. Weiss] asked are there any

other parts that are not okay to touch she said, inside my pee-pee. And when [Ms. Weiss] further on down the interview ... asked her if anybody had ever touched those parts she said, [Appellant].

Victim detailed that the incident occurred at her father's house, stated that she was confused by why Appellant would do such a thing to her, and specifically indicated that Appellant touched her with his fingers.

Ms. Boehne testified at the section 491.075 hearing that as the executive director of the CAC she had extensive training in forensic interviewing in child sexual abuse cases; had attended numerous conferences and classes on the topic; and had personally conducted over 1000 forensic interviews with minors. She spoke with Victim for the first time less than two weeks after the event with Appellant. She reported that after identifying body parts on an anatomical drawing, they talked about "places on the body that it's not okay to touch and [Victim] indicated that [it] wasn't okay for someone to touch her pee-pee and her feet and her hair." Ms. Boehne then "asked her about the hair, if somebody touched her hair and she said that [Appellant] had and then [Ms. Boehne] asked her if someone had touched her pee-pee and she said that [Appellant] had." Victim then admitted Appellant had touched inside her vagina with his fingers and that it had occurred "at her dad's house, then she talked about it happening in a living room, also in her bedroom and also outside." She then indicated that he had also touched her on the outside of her clothes, but "she continued to state ... several times in the interview ... that he touched her inside her pee-pee." She indicated she was wearing underwear at the time but that he "had stuck his hand in her

underwear...." Ms. Boehne further related Victim

> talked about one time when she was in the living room and she was sleeping on the floor and [Appellant] was on the couch and [her] dad was in his bedroom along with her baby brother. And then she talked about another time that she was in the living room and she thought her dad was ... at work or he was out making money.
>
> ....
>
> She talked about one time when they were outside and [Appellant] said come here a minute. And then she also talked about a time when he asked her to close her eyes.

Victim also told Ms. Boehne during the interview that her vagina hurt and indicated it was because Appellant had hurt her. The videotape of Ms. Boehne's CAC interview with Victim, which was admitted at trial per section 491.075, was in conformity with her testimony at the hearing.

Ms. Daugherty, who had a master's degree in counseling and was a board certified professional counselor, testified that after discussing the difference between the truth and a lie Victim disclosed to her that Appellant "touched [her] pee-pee," a statement that Victim maintained the veracity of throughout their first session. It was at the third session that Victim recanted her previous statements in such an uncharacteristic way that Ms. Daugherty brought in Victim's parents to help clarify the situation. It was then that Victim admitted her grandmother has tried to influence her to change her story about Appellant and she again maintained Appellant had touched her inappropriately.

■ To determine the reliability of a child's out-of-court statements for the purposes of section 491.075, Missouri courts look to the totality of the circumstances. *State v. Sprinkle,* 122 S.W.3d 652, 661 (Mo.App.2003). In making this determination, the following non-exclusive factors are considered: "(1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) the lack of motive to fabricate; and (4) knowledge of subject matter unexpected of a child of similar age." *Id.* "The lapse of time between when the acts occurred and when the victim reported them is also a factor to consider." *Id.* The trial court may also consider the "technique employed by the interviewer" in eliciting those statements. *State v. Thompson,* 341 S.W.3d 723, 729 (Mo.App.2011). "The trial court decides whether or not to admit the victim's out-of-court statements based on the information provided at the hearing." *Sprinkle,* 122 S.W.3d at 661. This Court reviews the trial court's decision in a section 491.075 hearing for an abuse of discretion. *State v. Redman,* 916 S.W.2d 787, 792 (Mo. banc 1996).

Here, the trial court did not abuse its discretion in allowing Victim's statements to Ms. Miller, Ms. Weiss, Ms. Boehne, and Ms. Daugherty because there was sufficient indicia of reliability based on the totality of the circumstances. In the present matter, Victim's assertion to each of the aforementioned four witnesses was that Appellant had touched her inside her vagina with his fingers. She was unfailing in her details relating to the incident as to when and where it occurred and she did not expand on the story as time passed. The techniques employed by all four witnesses were not inappropriate as they did not appear to lead or influence Victim's disclosures. Further, there was evidence that all four witnesses had been trained in dealing with child sex abuse victims and were familiar with disclosures of such abuse. Moreover, Victim readily gave information to all four witnesses and did not appear to have been coaxed or persuaded

into disclosing. Further, Victim's disclosures to Ms. Miller and Ms. Weiss occurred within 24 hours of the incident at issue and her discussion with Ms. Boehne occurred within two weeks of the incident such that they were near in time to the incident. Additionally, there was testimony about Victim's mental state from Ms. Miller that Victim was angry at what Appellant had done to her and both Ms. Weiss and Ms. Daugherty testified that Victim was confused by Appellant's actions in that he was her paternal grandfather. Based on the totality of the circumstances, the out-of-court statements made by Victim to Ms. Miller, Ms. Weiss, Ms. Daugherty, and Ms. Boehne bore sufficient indicia of reliability to warrant their admission under section 491.075 and the trial court did not abuse its discretion in admitting them.[6] *Sprinkle*, 122 S.W.3d at 661. Likewise, the trial court did not err in admitting the videotape of Victim's CAC interview. *Id.* Point denied.

■ In his second point relied on Appellant maintains the trial court plainly erred in failing to "intervene and admonish the jury to disregard [Ms.] Daugherty's testimony when she opined that [Victim] 'was talking about something that actually happened to her' and that there was no doubt that [Victim] was the victim of sexual abuse...." He asserts this testimony by Ms. Daugherty "constituted an impermissible opinion of another witness' credibility, thereby usurping the function of the jury and causing [A]ppellant prejudice by bolstering [Victim's] credibility with an expert

witness." He then argues that "[t]his testimony, from a counselor, made it inevitable that [A]ppellant would be convicted."

Here, during Ms. Daugherty's direct testimony at trial, the following occurred:

THE STATE: Ma'am, and you watch for signs, do you not, during the course of your treatment, that is, whether the child is talking about a real event or something that is not real, is that true?

MS. DAUGHERTY: Yes.

THE STATE: In this particular case was it very clear to you that she was talking about something that actually happened to her?

MS. DAUGHERTY: Yes.

THE STATE: This is not a child that was fantasizing or having trouble distinguishing reality, this was something that happened?

MS. DAUGHERTY: Yes. And in the beginning of our sessions when I first did the intake I asked her do you know the difference between a truth and a lie, and I even used examples, and I think, like I said today was Christmas and that's a lie and things like that.

THE STATE: So you took some steps to qualify her—

MS. DAUGHERTY: Tried to.

THE STATE:—as being someone that can distinguish between truth and reality—or truth and untruth?

MS. DAUGHERTY: Yes, sir.

THE STATE: Ma'am, any doubt in your mind that this child was the victim of sexual abuse?

MS. DAUGHERTY: No.

6. We note Appellant also appears to argue under this point relied on that there was some sort of duty or responsibility on the part of the witnesses in this matter to investigate statements Victim made concerning Travis and another person as well as a statement that Victim had a pen mark near her genitals. We find no such obligation and Appellant fails to cite this Court to case law saying otherwise.

" 'We are not required to review ... arguments when they appear without citation of applicable authority.' " *State v. Paulson*, 220 S.W.3d 828, 836 n. 7 (Mo.App.2007) (quoting *State v. Thompson*, 147 S.W.3d 150, 163 (Mo. App.2004)). " 'When no authority is cited and no explanation is otherwise given for its absence, a point relied on is deemed waived or abandoned.' " *Id.*

Appellant did not object to this testimony by Ms. Daugherty. On cross-examination, the following exchange then occurred between counsel for Appellant and Ms. Daugherty:

COUNSEL FOR APPELLANT: Yes. So you responded to a question from [the State] just now that understanding cognitive development, reaching cognitive development levels, understanding a child's abilities to determine fact from fiction is a big part of what you do, correct?

MS. DAUGHERTY: Yes, sir.

COUNSEL FOR APPELLANT: But you don't get information on that or opinions from anybody else?

MS. DAUGHERTY: No, I'm pretty much told to make my own conclusion.

"It is well-established law that 'expert testimony is admissible if it is clear that the subject of such testimony is one upon which the jurors, for want of experience or knowledge, would otherwise be incapable of drawing a proper conclusion from the facts in evidence.'" *State v. Haslett,* 283 S.W.3d 769, 779 (Mo.App.2009) (quoting *State v. Faulkner,* 103 S.W.3d 346, 360–61 (Mo.App.2003)). Furthermore, in "a criminal case, an expert may testify concerning his or her opinion on an ultimate issue, but the testimony must aid the jury and not invade the jury's province." *Id.*; *see State v. Pickens,* 332 S.W.3d 303, 321–22 (Mo. App.2011). While an expert witness should not be permitted to comment on the veracity of another witness, an expert is permitted to testify as to his or her opinion on an ultimate issue in a criminal case as long the opinion does not state that the defendant is guilty of the crime. *Haslett,* 283 S.W.3d at 779. The admission of expert testimony is within the sound discretion of the trial court and shall not be overturned absent an abuse of discretion. *State v. Tyra,* 153 S.W.3d 341, 348 (Mo. App.2005).

Here, the two responses by Ms. Daugherty supported her determination that Victim had been sexually abused. It is important to note that Ms. Daugherty never stated Appellant was guilty of the crime of statutory sodomy in the first degree. Reading her testimony as a whole, Ms. Daugherty merely stated that it was her opinion that Victim had been sexually abused. *See State v. Fewell,* 198 S.W.3d 691, 697–98 (Mo.App.2006) (holding there was no impermissible comment on Victim's credibility where the expert witness "answered affirmatively when asked, 'But, it's your opinion that Victim was sexually abused as she reported to you, right?'"). In the instant matter, "[w]hen [Ms. Daugherty's] testimony is read as a whole, we cannot see how [her] comments can be viewed as vouching for Victim's credibility." *Id.* at 698. Ms. Daugherty's "opinion that [testimony] Victim was sexually abused, although based in part on [Victim's] allegations of abuse," does not facially establish clear error. *Id.*

Furthermore, the statements in question were brief, the prosecutor asked no further questions along these lines and there was no emphasis on these statements in closing argument. *See Pickens,* 332 S.W.3d at 324. Additionally, it is not lost on this Court that Appellant's argument is that the trial court should have *sua sponte* taken the initiative to admonish the jury or intervene because Ms. Daugherty's testimony was impermissibly offering her opinion. Although Appellant claims the trial court should have interrupted the trial and intervened in testimony to which no objection had been made, it is clear that a trial court "should act [sua sponte] in the trial of a case only in exceptional circumstances." *State v. Wright,* 216 S.W.3d 196, 199 (Mo.App.2007); *see State v. Nunley,* 353 S.W.3d 440, 444 (Mo.App.2011). " 'Uninvited interference by the trial judge in trial proceedings is generally discouraged,

as it risks injecting the judge into the role of a participant and invites trial error.'" *Nunley*, 353 S.W.3d at 445 (quoting *State v. Jennings*, 322 S.W.3d 598, 602 (Mo.App. 2010)). This is because a trial judge is "in a better position to evaluate the prejudicial effect of the proffered question and, although not objected to, determine[ ] that no harmful result occurred." *State v. Drewel*, 835 S.W.2d 494, 498 (Mo.App. 1992). Appellant has not proven that the trial court abused its discretion in failing to sua sponte intervene in these proceedings. As a result of the foregoing, we see no facial reason to believe the jury unduly weighed Victim's testimony due to Ms. Daugherty's comments. Here, there was no "'evident, obvious, and clear'" error. *Roper*, 136 S.W.3d at 900 (quoting *Scurlock*, 998 S.W.2d at 586). Point II is denied.

The judgment and sentence of the trial court is affirmed.

JEFFREY W. BATES and DANIEL E. SCOTT, JJ., concur.