

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD86606 |
| | ) | |
| NANCY RUSSELL, | ) | Filed: July 29, 2025 |
| | ) | |
| Appellant. | ) | |

### APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
### THE HONORABLE J. DALE YOUNGS, JUDGE

### BEFORE DIVISION ONE: KAREN KING MITCHELL, PRESIDING JUDGE, LISA WHITE HARDWICK, JUDGE, AND MARK D. PFEIFFER, JUDGE

Nancy Russell appeals her convictions and sentences for four counts of first-degree domestic assault and four counts of armed criminal action. Russell contends the circuit court plainly erred in allowing a treating physician to offer what she claims was inadmissible particularized testimony that improperly vouched for the victim's credibility. For reasons explained herein, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

Russell does not challenge the sufficiency of the evidence to support her convictions. In October 2017, Victim was nine years old and lived in Kansas City with

Russell, who was his mother, and his younger sister. On October 1, 2017, Russell came into the house angry about money. She then got angry with Victim for incorrectly doing his chores. Russell "whooped" Victim, first with an extension cord and then with what Victim described as a "metal pole." Afterward, there was blood everywhere, and Russell made Victim clean it up. Russell did not check Victim's injuries but told him to go to bed.

The next morning, Victim's grandfather ("Grandfather") picked up Victim. Grandfather saw Victim's injuries but did not ask what happened. He cleaned Victim's wounds, kept Victim overnight, and called Victim's grandmother ("Grandmother"), who lived in Arkansas. Grandfather asked Grandmother to meet him halfway between Kansas City and Arkansas to pick up Victim and his sister. Grandmother found Victim's arm wrapped in paper towels and tape, and Victim was holding his arm and crying. When Grandmother unwrapped the towels, she saw a "big gash" on Victim's arm that was "real bad." She took Victim and his sister to Arkansas and drove straight to an emergency room. When Grandmother asked Victim what happened, he told her "his momma took a pipe and was hitting him on his arm."

When Victim arrived at the emergency room on the morning of October 4, 2017, he needed a wheelchair because he could not walk. He had bruising in various stages of healing on his arms and legs, his legs were swollen, and he had lacerations and abrasions to his forearms, face, head, and ear. Additionally, his foot was fractured. Victim told the emergency room nurse that "his momma hit him with a metal pole because he didn't fold the clothes right." The nurse believed Victim's injuries were consistent with abuse. A

2

police officer interviewed Victim at the hospital. Victim told the officer that "his mom was mad at him because he didn't do the laundry correctly and she started beating him with a metal pipe" on his head, back, arm, and legs. Victim was transferred to Arkansas Children's Hospital for specialty treatment of his injuries.

At Arkansas Children's Hospital, Victim was treated by a pediatrician who specialized in medicine related to child abuse and neglect ("Doctor"). According to Doctor, Victim's injuries were a few days old and had not been treated. Doctor took a focused history from him to determine the cause of his injuries. Victim said his mom had hit him with a metal pipe. Doctor documented "innumerable injuries from head to toe," four major open wounds, and a broken foot. Additionally, Victim had two large open lacerations on his scalp, a deep laceration that caused obvious deformity to his right ear, and a laceration on his left forearm that was "down to the muscle." Victim's low red-blood cell count was consistent with significant blood loss. Also, he had excessive quantities of the creatine kinase enzyme, which is caused by the breakdown of muscle tissue and is sometimes seen in physically abused children when they have had extensive blunt force trauma to muscles in different parts of their body. Doctor also noted numerous scars, patterned and non-patterned, all over Victim's body, in various stages of healing. Doctor opined Victim's injuries were consistent with inflicted trauma and with the history he provided.

Victim was interviewed by a forensic interviewer while at Arkansas Children's Hospital. Victim told the interviewer he had gotten a "beating" and a "whooping" by Russell with an extension cord and a metal pole because he had not done his chores.

3

Victim said he had been hit with extension cords, belts, and switches before, and that Russell had punched, kicked, and stomped on him before.

In March 2019, Russell was indicted on four counts of first-degree domestic assault and four counts of armed criminal action.[1] A jury trial was held in March 2023. In cross-examining the police officer who talked to Victim at the first hospital, defense counsel elicited from the officer that, several years after the incident, Victim recanted his claim that Russell caused his injuries, instead saying that his stepfather had caused them in Arkansas. However, Victim later recanted his claim that his stepfather had caused his injuries. During his trial testimony, Victim said he did not remember how he got his injuries, but he said he told the truth when he was interviewed in 2017, and no one told him to lie about it. Russell testified in her own defense, denying that she caused any of Victim's injuries. She denied knowing about Victim's broken foot or the severity of Victim's cut on his arm, which she claimed happened while he was playing with other kids in the woods and fields in Kansas City, and she was unable to explain Victim's head and scalp injuries.

The jury found Russell guilty on all counts. The court sentenced her to concurrent terms of 15 years in prison on each of the four first-degree domestic assault counts, to run consecutively to concurrent terms of five years in prison on each of the four armed criminal action counts, for a total prison term of 20 years. Russell appeals.

_____

[1] The State filed an information in lieu of indictment charging the same offenses in February 2023.

## STANDARD OF REVIEW

Russell admits she did not preserve her point on appeal because she failed to object to the allegedly improper testimony and assert it as error in her new trial motion. Therefore, she requests plain error review. Rule 30.20 gives us discretion to review for "plain errors affecting substantial rights" when we find that "manifest injustice or a miscarriage of justice has resulted therefrom." In conducting plain error review, this court first must determine whether the claim of error "facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted." *State v. Mills*, 687 S.W.3d 668, 675 (Mo. banc 2024) (citation omitted). "All prejudicial error, however, is not plain error, and plain errors are those which are evident, obvious, and clear." *Id*. (citation omitted). If we find plain error, we then must determine whether the error resulted in manifest injustice or miscarriage of justice. *Id*. "To obtain a new trial on direct appeal based on a claim of plain error, the appellant must show the error was outcome determinative." *Id*. (citation omitted).

## ANALYSIS

In her sole point, Russell contends the circuit court plainly erred in allowing Doctor to offer what she claims was particularized expert testimony that improperly vouched for Victim's credibility. After detailing Victim's injuries, Doctor testified the injuries she observed on Victim were consistent with inflicted trauma and, specifically, were consistent with someone who had been struck by a metal pipe. The State then asked Doctor, "[Does] the fact that a child told you the manner in how the injuries occurred

5

rather than an adult say, hey, [this] is how those injuries occurred, does that affect what was told to you in any way?" Doctor replied:

> Yes. So children don't really have as much ability to – people raise the question about like children tell stories, children make up stories. What they do is children make up stories about things that are developmentally appropriate for them to make up stories about. They make up stories about their favorite movie character, they make up stories about things that children make up stories about.
>
> *One thing that they're not really developmentally able to do is to make up a history that is false but contains a plausible mechanism for traumatic injuries, you know, that would match the specific injuries, just not really plausible for a nine-year-old child to do.*

(Emphasis added.) Russell asserts Victim's credibility at nine years old, the age when he alleged she caused his injuries using a metal pipe, was the central issue to be resolved by the jury, and Doctor's particularized testimony about Victim's credibility usurped the jury's function as the ultimate fact finder in this case.

To support her claim that Doctor's testimony was inadmissible, Russell cites the distinction commonly made in child sex abuse cases between generalized and particularized expert testimony. While an expert is permitted to give generalized testimony that describes "the general behaviors and characteristics commonly found in children who have been abused, "an expert is not allowed to give particularized testimony "regarding the specific victim's credibility." *State v. D.W.N.*, 290 S.W.3d 814, 817 (Mo. App. 2009). Particularized expert testimony "is inadmissible because it usurps the jury's province to determine the credibility of witnesses." *Id*.

Russell argues Doctor's testimony is similar to inadmissible particularized testimony in *State v. Williams*, 858 S.W.2d 796 (Mo. App. 1993). In *Williams*, a doctor

6

testified that sexually abused children "very rarely" lie about abuse, that incidents of lying among sexually abused children are "very low, less than three percent," and that, if the child is not asked leading questions, then the child's spontaneous response about who committed the sexual abuse "declares who it was." *Id*. at 800. On appeal, the court held this testimony "went beyond admissible testimony concerning general, behavioral characteristics of sexually abused children" and vouched for the victim's credibility, supplying "improper verisimilitude on the issue of whether the appellant was guilty." *Id*. at 801.

Unlike the doctor in *Williams*, Doctor did not opine on the overall credibility of Victim or of nine-year-old children in general. As the context of her testimony shows, Doctor limited her testimony to the developmental ability of a nine-year-old child to fabricate a plausible *mechanism* for his injuries, *i.e.*, being struck by a metal pipe. "[A]n expert is permitted to testify as to his or her opinion on an ultimate issue in a criminal case as long as the opinion does not state that the defendant is guilty of the crime." *State v. Wadlow*, 370 S.W.3d 315, 322 (Mo. App. 2012). Doctor did not discuss whether Victim's statement that Russell was the one who struck him was credible, and she did not offer any opinion on the ability of a nine-year-old child to fabricate the *perpetrator* of his injuries. *See State v. Johnson*, 477 S.W.3d 218, 224 (Mo. App. 2015) (finding an expert's "diagnosis of child sexual abuse did not amount to an improper expert witness comment on [the victim's] veracity as a witness insofar as [the expert] never identified [the appellant] as the perpetrator of the abuse"). Rather, the clear purpose of the testimony at issue was to discuss the accuracy, based on the developmental ability of

7

nine-year-old children in general, of Victim's statement that he was struck by a metal pipe, which supported Doctor's opinion that Victim's injuries were, in fact, caused by being struck by a metal pipe. *See State v. Carpenter*, 605 S.W.3d 355, 362 (Mo. banc 2020) (noting the distinction between expert testimony regarding accuracy versus credibility).

As such, Doctor's testimony is similar to the testimony at issue in *Wadlow*, 370 S.W.3d at 321-22. In *Wadlow*, a counselor affirmed during her testimony that, after watching for signs as to whether a child victim was talking about a real event or a something that was not real, "[i]n this particular case . . . it was very clear to [counselor] that [the victim] was talking about something that actually happened to her." *Id*. at 321. The counselor further affirmed that, after she determined whether the victim could distinguish between truth and untruth, there was not "any doubt in [her] mind that this child was the victim of sexual abuse." *Id.* On appeal, the court found this testimony did not constitute plain error because it did not vouch for the victim's credibility but merely supported the counselor's opinion that the victim had been sexually abused and, additionally, the counselor never stated the appellant was guilty of committing the abuse. *Id*. at 322. *See also State v. Webb*, 674 S.W.3d 189, 191-93 (Mo. App. 2023) (holding expert's testimony that the triggering event for the victim's PTSD was the sexual assault the victim experienced did not vouch for the victim's credibility and, therefore, did not constitute plain error); and *State v. Collins*, 163 S.W.3d 614, 623 (Mo. App. 2005) (finding expert's testimony that the victim's penchant for correction during her interview was "one of the hallmarks of credibility for kids" was not directed to the victim's overall

credibility as a witness but, instead, was merely a comment on the expert's ability to assess the victim's believability in the story related to the expert).  Based on *Wadlow*, *Webb*, and *Collins*, Doctor's testimony in this case did not vouch for Victim's credibility.

Russell has failed to demonstrate Doctor's testimony constituted evident, obvious, and clear error such that the circuit court should have *sua sponte* intervened.  Circuit courts "should act sua sponte in the trial of a case only in exceptional circumstances." *Wadlow*, 370 S.W.3d at 322 (citations omitted).  "Uninvited interference by the trial judge in trial proceedings is generally discouraged, as it risks injecting the judge into the role of a participant and invites trial error." *Id*. at 322-23 (citations omitted).  Russell has not made the requisite facial showing necessary for this court to engage in plain error review.  *See Webb*, 674 S.W.3d at 193.  Point denied.

### CONCLUSION

The judgment is affirmed.

_____
LISA WHITE HARDWICK, JUDGE

All Concur.

9