STATE of Missouri, Plaintiff–
Respondent,

v.

Marlin Dallas LANE, Defendant–
Appellant.

No. SD 32044.

Missouri Court of Appeals,
Southern District,
Division Two.

Dec. 10, 2013.

Motion for Rehearing and/or Transfer
to Supreme Court Denied Dec.
30, 2013.

---

Rosalynn Koch, Columbia, MO, for appellant.

Chris Koster, Attorney General, and Daniel N. McPherson, Assistant Attorney General, Jefferson City, MO, for respondent.

GARY W. LYNCH, J.

Following a jury's guilty verdict and the trial court's imposition of a twelve-year sentence of incarceration, Marlin Dallas Lane ("Defendant") appeals his conviction on one count of statutory sodomy in the first degree, *see* section 566.062.2.[1] Defendant claims the trial court abused its discretion in admitting certain testimony and a recording of a forensic interview of the victim and in denying his motion for new trial. In addition, he claims that the trial court erred in overruling his motion for judgment of acquittal and in failing to intervene during closing argument when the prosecutor allegedly misstated evidence presented at trial. Finding no merit in Defendant's claims, we affirm.

***Factual and Procedural Background***

Defendant challenges the sufficiency of the evidence to support his conviction. The evidence adduced at trial in the light most favorable to the verdict established the following. *See State v. O'Brien,* 857 S.W.2d 212, 215 (Mo. banc 1993). Victim was born in November 2006. When she was about four months old, her parents separated; their divorce was final in June 2007. Victim remained in the custody of her mother ("Mother") and had no relationship with her biological father for more than two years following the divorce.

In April 2007, Mother began dating Defendant. Victim was about five months old at that time. Early in July 2007, Mother learned she was pregnant with Defendant's child. During a visit to her obstetrician at the end of July, Mother was diagnosed with chlamydia. Mother and Defendant married September 9, 2007, and Defendant lived with Mother and Victim thereafter. Two months before their son

1. References to section 566.062 are to RSMo Cum.Supp.2006.

was born in March 2008, Mother was diagnosed for the first time in her life with genital warts. During Mother's pregnancy, Defendant was also having problems with chlamydia and genital warts.

Mother and Defendant separated in the fall of 2008, and afterward, Defendant moved in with his mother and step-father. Mother and children moved in with her parents. Until a vehicular accident in February 2009 left Defendant severely injured, he babysat the children while Mother worked. After the accident, Defendant was hospitalized for almost six weeks and returned to live with his mother and step-father after his release. Defendant was in a full brace that extended from his neck to his stomach until October 2009. After Defendant's accident, the children generally stayed at the home of a babysitter, although they stayed with Defendant and his parents on occasion. Although Victim was not the biological child of Defendant, up until that time, he was the only father she had known.

Mother and Defendant's divorce was finalized in September 2009. Their son lived with Mother, and the couple had amicably agreed to a visitation schedule for Defendant. Sometime in September 2009, Defendant called Mother after Victim had been at his house to tell Mother that Victim might say that he had touched her, but he had just tickled her. After that, Mother quit taking Victim to see Defendant, but she continued to allow their son to visit. At some point, however, Mother stopped taking their son to visit Defendant, saying she wanted to protect him.

Dr. Gabrielle Curtis diagnosed Victim with genital warts in September 2009 during a well-child visit. Victim was two years old and turned three the following November. Dr. Curtis did not place a hotline call based on Victim's diagnosis

because she believed Victim was safe in her mother's care. When Victim's condition worsened and after she began having urinary tract infections and yeast infections, Mother took Victim back to the doctor. On October 30, 2009, Victim was referred to Dr. Timothy Fursa, who then contacted Family Services "to report a case that could potentially be child abuse." In his opinion, "a diagnosis of genital warts or the contraction of genital warts oftentimes comes through genital-to-genital touching or touching of the genitalia."

Jennifer Blankenship, an investigator with the Children's Division, was assigned to investigate. She contacted the Webster County Sheriff's Office and contacted Mother on October 31 to schedule a visit at her home. After the visit to Mother's, Blankenship contacted a deputy to report what she had learned and then scheduled a forensic interview at a Child Advocacy Center ("CAC") on November 18, 2009.

Victim underwent a SAFE exam in November 2009. Before that examination, Victim had never said anything about being subjected to abuse. The nurse practitioner who examined Victim, Cindy Tull, saw multiple venereal warts on Victim's anus and labia. An extremely large wart obstructed much of the hymen, and she was unable to assess whether there was injury to the hymen. Although she could not say definitively, such symptoms made her "highly suspicious" that sexual abuse may be involved, because genital warts "are predominantly sexually transmitted." She could not definitively say that Victim's genital warts were a result of sexual abuse and, while it is possible that genital warts can be transmitted in other ways, she opined it was "not probable." She referred Victim's case to Dr. David Redfern.

Dr. Redfern reviewed photographs obtained during the SAFE exam of Victim. He diagnosed genital warts around Vic-

tim's rectum, anus, the opening of the vagina, and hymen, and detected a large genital wart on the hymen. He testified that human papilloma virus (HPV) causes genital warts and is most usually transmitted via "skin-to-skin contact." He also opined that the wart on the hymen was "a red flag indicative of the potential increased risk for sexual assault."

During the SAFE exam, Blankenship watched through a two-way mirror; she did not speak with Victim. At that time, Victim never stated that she had been subjected to any abuse. Blankenship observed, however, that interviews with three-year-olds are sometimes not productive, and it is "less likely" that a three-year-old discloses abuse. On November 30, 2009, Blankenship notified Mother that the case was being closed. She recommended that Victim participate in play therapy, which she advised can assist young children in working through traumatic experiences.

Victim participated in play therapy sessions beginning January 20, 2010. Kelley Jones, a licensed professional counselor and registered play therapist, was Victim's therapist at the Victim's Center. The goal of play therapy is to provide a therapeutic environment for kids to enable them to communicate through play. In all, she saw Victim about fifty times. On March 17, 2010, during a play therapy session, Jones told Victim that Mother had said there had been touching problems. Victim stated, "[M]y daddy touched my privates." Victim also "stated it was with his body." Victim told Jones that "she loved her daddy and that he loved her." In another session, on April 7, 2010, Victim told Jones, "My bubby's daddy hurt me." Victim sometimes referred to her little brother as "Bubby." She further stated that "he hurt her face on both cheeks and her belly." Play therapy was terminated after a May

12 visit on Jones's belief that Victim was exhibiting normal developmental play. Play therapy sessions resumed in October 2010 following laser surgery to remove Child's genital warts.

At some point early in 2010, Defendant filed a motion to modify custody of his son; Mother had not been allowing their son to visit Defendant because she said she was trying to protect him. In her response to Defendant's motion, Mother alleged that Defendant had harmed Victim.

In August 2010, Mother took Victim to her OB/GYN, Dr. Lisa Powell, after the pediatrician's treatment for Victim's recurring yeast infections was unsuccessful. Mother informed the doctor that Victim had a vaginal discharge that would not clear up. Treatment for Victim's genital warts had not been successful, and she underwent laser surgery in September 2010.

Dr. Powell observed that Victim also had "a persistent vaginal discharge" that was difficult to "clear up." She stated that external yeast infections are pretty common in females, but girls as young as Victim was at that time usually do not have the discharge associated with it as Victim had. In regard to the source of Victim's genital warts, Dr. Powell testified that genital warts are caused by the human papilloma virus (HPV), however there were no indications that Mother had HPV while she was pregnant with Victim and definitely had no genital warts at the time Victim was delivered.

Victim began "acting out sexually." She was caught masturbating several times, to the point she made herself raw, and she would take the pants off her dolls and say "their pee-pees needed to be seen[.]" Mother also caught Victim trying to touch her brother's privates and him trying to touch Victim's. Mother received a call from Victim's babysitter on January 28,

2011, wherein the babysitter told Mother about Victim masturbating during a naptime. When Mother returned home that day, Victim ran to her, "crying, saying that she had something to tell[,]" and Victim told Mother that she had been touching her privates. When Mother asked why, Victim said because it felt good. Mother asked how she knew it felt good, and Victim told her "that Daddy Dallas has used his fingers on her pee-pee and then he had used his pee-pee on her pee-pee." On January 31, 2011, Mother called Kelley Jones to report what Victim told her. Jones placed a call to the hotline. Sue Tucker, an investigator with the Children's Division in Webster County, set up an interview at the CAC and contacted law enforcement.

On February 8, 2011, Ashley Weaver, a forensic interviewer at CAC, interviewed Victim for the second time. This interview was videotaped, admitted as State's Exhibit 2, and published to the jury. Victim was four years old at the time of the interview. When the interview started, Ms. Weaver commented on an angel pin that Victim wore on her top. Victim told her that it was to help her talk about what happened. When Ms. Weaver reiterated what Victim said, Victim volunteered that "Bubby's daddy just touched my privates and touched his private with mine."[2] Victim repeated that "he touched me with his private." She said that happened once and it occurred at Defendant's house. She gestured to her own crotch when she was asked where she was touched. At one point, she said her mother was not there, but later she said Mother was in the kitchen. She did not "remember when he got [her] hurt." Victim was four years old at the time of the interview, and the abuse

allegedly occurred when she was three years old. Victim identified both male and female genitalia as "pee-pee" and "privates." She further stated that she did not "want him to stick his whole finger in mine." She also said that his finger touched her pee-pee and that he poked her in her pee-pee. When asked, she said it did not feel good. On an anatomical drawing of the frontal view of a male, Victim pointed to the groin area and told Ms. Weaver, "Here are his privates." In her interaction with anatomically correct dolls, Victim was preoccupied with taking the clothing off the dolls "to see [their] whole privates." At one point, Victim stated she did not want to talk about Daddy Dallas because "he's a bad daddy now." Sue Tucker, an investigator with the Children's Division relayed information Victim disclosed to Mother following the interview and later obtained medical releases from Defendant.

Victim attended another play therapy session on February 23, 2011, during which she discussed her visit to the CAC. Victim told Jones, "Yes, I told them Daddy Dallas hurt me." Victim said he did it by accident and did not mean to, but she did not want to talk further. On March 16, 2011, Victim told Jones that "Daddy Dallas" was in jail because "he hurt me" and "so that he could not hurt other children." Victim told Jones she had gone to CAC and told what Daddy Dallas did to her. She further stated that she felt sad that Defendant was in jail because Defendant used to give her Cheetos, which Mother does not buy, and she thought of Defendant when she eats them. During another play therapy session on May 4, 2011, when Victim heard a siren from a passing emergency vehicle outside, Victim stated that

2. As previously noted, "Bubby" was a nickname Victim sometimes used for her younger brother, who is Defendant's son.

they were taking the bad people to jail and that bad people go to the devil, that she was going to heaven but Daddy Dallas would go to the devil. When Jones asked why, Victim stated, "Because he touched his privates to my privates." In a May 25, 2011 play therapy session, Victim reported having bad thoughts about touching her brother's "pee-pee" and said he touches hers, too, and that it had happened "so much [she] can't even remember."

### Charges Filed Against Defendant

Initially, Defendant was charged in Webster County on April 13, 2011, with statutory sodomy in the first degree, section 566.062, and statutory rape in the first degree, section 566.032. The charges asserted that Defendant had deviate sexual intercourse with a person less than fourteen years old and that Defendant knowingly had sexual intercourse with a person less than twelve years old.

### Pre-trial Proceedings

Upon Defendant's motion, venue was changed to Hickory County. Thereafter, the State gave notice of its intent to use hearsay evidence of a child under the age of twelve years old, and a section 491.075 hearing ("Chapter 491 hearing") was scheduled and held by the trial court.[3] Following this hearing, the trial court

ruled that Victim's statements made to Mother and the February 8, 2011 CAC interview tape of Victim (later admitted at trial as State's Exhibit 2) were admissible.

### The Trial

A jury trial was held February 29 through March 2, 2012. Before voir dire began, on February 29, 2012, the trial court granted leave for the State to amend its information to allege, in part, "that on or about August 15, 2009 through September 15, 2009," Defendant committed the felonies of statutory sodomy in the first degree ("Count I") and statutory rape in the first degree ("Count II").

Victim was the first to testify. Following her testimony, the State called other witnesses, however none of the testimony elicited from the witnesses that day related to any out-of-court statements made by Victim.

Before the start of the second day of the trial and outside the presence of the jury, defense counsel[4] requested that the trial court reconsider its ruling on the admissibility of Victim's out-of-court statements "given the light of the testimony of the child yesterday."[5] Counsel characterized Victim's testimony as follows: "[M]ommy told me what the truth was. She told me

---

3. A hearing as provided under section 491.075 is often referred to as a "Chapter 491 hearing."

4. Defendant's trial counsel did not represent Defendant on appeal.

5. Victim's testimony covered eight pages in the transcript. Defense counsel elicited the following testimony from Victim at the conclusion of her cross-examination:

Q. [by defense counsel] ... Do you remember why you're here today?
A. [by Victim] Yes, to tell the truth.
Q. To tell the truth. And have you told the truth so far?

A. Mommy told me what it was.
Q. Mommy told you what the truth was?
A. Yeah.
Q. Okay. And she told you tell that today?
A. Yes.
Q. And what did she tell you that the truth was?
A. It was Daddy Dallas touched his pee-pee with mine.
Q. And your mommy told you that's what—what you needed to say today?
A. Yes, but I don't know if it's the truth or not.
Q. You don't know if it's the truth or not?
A. I don't know.

to say Daddy Dallas touched his pee-pee to my pee-pee; I don't know if that's the truth or not." Counsel further contended that Child "told the jury that she wasn't sure that those statements were true and she was only saying them because her mommy told her to." Counsel argued that, absent a finding of reliability, any further testimony from third parties about what Victim told them should "be excluded because they'd now be hearsay." The trial court overruled Defendant's motion and the trial resumed.

During Kelly Jones' direct examination by the State, and before she testified to any out-of-court statements made by Victim, defense counsel renewed her objection to testimony regarding what Victim "said to any outside party" because, based on section 491.075, "these statements are not reliable given the child's testimony ... and on the fact that they're hearsay. The child testified that her mommy told her to say those things." At that point, the trial court overruled counsel's objection and took it as a continuing objection. Jones then testified to Victim's statements made to her during play therapy, and Mother testified about Victim's previous statements made to her, both without any further objection by Defendant.

After the State rested its case, Defendant moved for a judgment of acquittal, and arguments were heard. Defense counsel contended that the State failed to prove the essential elements of the crimes charged. Regarding the charge of statutory rape, counsel contended that there was no showing that penetration occurred. The trial court agreed. While it overruled Defendant's motion as to Count I, which charged statutory sodomy in the first degree, it sustained Defendant's motion as to Count II, statutory rape in the first degree. That charge was dismissed with prejudice. Defendant then called two witnesses and rested.

At the close of all of the evidence, Defendant moved for a judgment of acquittal on the remaining count, which the trial court overruled. The case was submitted to the jury on March 2, 2012, at 10:15 a.m., and thirty-five minutes later, the jury returned with a guilty verdict.

### After Trial Actions

Defendant's after-trial motion for judgment of acquittal or, in the alternative, for new trial included claims that the trial court erred in allowing Mother to testify about Child's out-of-court statements and in admitting State's Exhibit 2, the videotape of Child's forensic interview at the CAC. In those claims, Defendant contended that statements by Child were hearsay because her testimony at trial "proved that her earlier statements were unreliable."

On May 10, 2012, the trial court overruled Defendant's motion for acquittal and for new trial and sentenced Defendant to a term of twelve years' confinement in the Department of Corrections with credit for time already served. Defendant timely appeals, presenting four points relied on.

### Discussion

### Victim's Out–of–Court Statements Were Admissible

In his first point relied on, Defendant challenges the admissibility of Victim's out-of-court statements through Mother's testimony and State's Exhibit No. 2, which the trial court determined were admissible after holding a pre-trial hearing pursuant to section 491.075.

■ "Enacted as an exception to the exclusionary hearsay rule, § 491.075 permits witnesses to testify regarding the out-of-court statements of a child sodomy victim if the statements are shown to be

sufficiently reliable." *State v. Porras,* 84 S.W.3d 153, 156 (Mo.App.2002). Applicable here, section 491.075 provides, in part:

1. A statement made by a child under the age of fourteen, ... relating to an offense under chapter 565, 566, 568 or 573, performed by another, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings in the courts of this state as substantive evidence to prove the truth of the matter asserted if:

(1) The court finds, in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

. . . .

(2)(a) The child ... testifies at the proceedings. . . .

"[I]t is within the trial court's discretion to determine if a child's out-of-court statements have sufficient indicia of reliability to be admissible." *State v. Walker,* 903 S.W.2d 636, 639 (Mo.App.1995).

▮ Review of the trial court's decision regarding the admission of a child's out-of-court statements under section 491.075 is limited to a determination of whether the trial court abused its discretion. *State v. Wadlow,* 370 S.W.3d 315, 320 (Mo.App.2012). "We will find that a trial court abused its discretion in admitting a child's out-of-court statements pursuant to Section 491.075 only where the trial court's findings are not supported by substantial evidence in the record." *State v. Thompson,* 341 S.W.3d 723, 729 (Mo. App.2011) (citing *In re N.J.K. v. Juvenile Officer,* 139 S.W.3d 250, 255 (Mo.App. 2004)). " 'If reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.' " *Id.* at 729 (quoting *N.J.K.,* 139 S.W.3d at 256).

▮ "The trial court decides whether or not to admit the victim's out-of-court statements based on the information provided at the [Chapter 491] hearing." *State v. Sprinkle,* 122 S.W.3d 652, 661 (Mo.App. 2003). Based upon that evidence,

[t]o determine the reliability of a child's out-of-court statements for the purposes of section 491.075, Missouri courts look to the totality of the circumstances. *State v. Sprinkle,* 122 S.W.3d 652, 661 (Mo.App.2003). In making this determination, the following non-exclusive factors are considered: "(1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) the lack of motive to fabricate; and (4) knowledge of subject matter unexpected of a child of similar age." *Id.* "The lapse of time between when the acts occurred and when the victim reported them is also a factor to consider." *Id.* The trial court may also consider the "technique employed by the interviewer" in eliciting those statements. *State v. Thompson,* 341 S.W.3d 723, 729 (Mo.App.2011).

*Wadlow,* 370 S.W.3d at 320.

▮ " '[T]he unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made.' " *Walker,* 903 S.W.2d at 639 (quoting *Idaho v. Wright,* 497 U.S. 805, 822, 110 S.Ct. 3139, 3150, 111 L.Ed.2d 638 (1990)). "[I]n assessing content-reliability, courts should not place undue emphasis on the particular vocabulary used by a child but must determine whether knowledge of the subject matter described by the child is unexpected of a child of similar age." *State v. Redman,* 916 S.W.2d 787, 789 (Mo. banc 1996).

Defendant's first point relied on is set forth below:

The trial court abused its discretion in admitting the testimony of [Mother] and

Ashley Weaver as to [Victim's] statements accusing [Defendant] and in admitting State's Exhibit 2, the recording of the forensic interview of [Victim], because these were inadmissible as substantive evidence pursuant to § 491.075, and consequently their admission violated [Defendant's] rights to due process of law and to a fair trial, as guaranteed by the Fourteenth Amendment to the United States Constitution [6] and Article I, Section 10 of the Missouri Constitution, in that the time, content and circumstances of the statements provided insufficient indicia of reliability, as [Victim] testified at trial that [Mother] had told her that her father had molested her, but she did not know if this was true; the alleged disclosure was made shortly before a custody hearing at which [Mother] was searching for witnesses and long after [Victim] had denied any touching; [Victim's] account was incoherent and lacked specifics; to [Defendant's] prejudice, as [Defendant] would not have been convicted without this evidence.

Initially, we note that there was no such claim in regard to the testimony of Ashley Weaver included in Defendant's Motion for New Trial. The only claim Defendant raised in that motion related to Ashley Weaver was that she was not properly certified as an expert in child psychology and the trial court erred in allowing her to testify regarding hypersexual behavior.

■ Furthermore, in that same motion, Defendant did not base any claim of error on two of his contentions asserted here on appeal—(1) that "the alleged disclosure was made shortly before a custody hearing at which [Mother] was searching for witnesses and long after [Victim] had denied any touching[ ] [and (2) that] [Victim's] account was incoherent and lacked specifics[.]" Therefore, these issues were not presented to the trial court to decide. An appellant "cannot broaden or change allegations of error on appeal[,]" and we will not convict the trial court of error on issues that were not presented below and raised for the first time here. *State v. Wolf,* 326 S.W.3d 905, 907 (Mo.App.2010). Thus, we decline to address these issues that were not preserved for appellate review in Defendant's motion for new trial. *See State v. Clay,* 975 S.W.2d 121, 131 (Mo. banc 1998).

■ Accordingly, the only claim in this point that Defendant preserved for our review is that the trial court abused its discretion in admitting testimony of Mother as to Victim's out-of-court statements and in admitting the State's Exhibit No. 2 "because these were inadmissible as substantive evidence pursuant to § 491.075, ... as [Victim] testified at trial that [Mother] had told her that her father [we presume "step-father" is intended here] had molested her, but she did not know if this was true."

While Victim's trial testimony may have been inconsistent with her out-of court statements to which Mother testified and those contained in State's Exhibit No. 2, it does not impact the admissibility determination previously made by the trial court under section 491.075. That determination, as required by section 491.075.1(1),

---

**6.** We note that the Supreme Court of Missouri, in *State v. Biggs,* 333 S.W.3d 472, 478 (Mo. banc 2011), held that in due process cases, the prevalent theme is that an accused must be allowed to present a complete defense, and evidence admitted pursuant to section 491.075 does not prevent a defendant from presenting a complete defense. Where the trial court determines that hearsay evidence admitted under the statute is reliable and the record supports that conclusion, a defendant's due process rights are not violated. *Id.*

was made based upon the evidence presented to the trial court during the Chapter 491 hearing. *Sprinkle,* 122 S.W.3d at 661. Defendant has not preserved for our review any claim based upon the evidence presented at the Chapter 491 hearing that the trial court abused its discretion in ruling that these out-of-court statements made by Victim were reliable.

Furthermore, Defendant cites us to no legal authority, and we can find none, requiring the trial court to reconsider its previous section 491.075 admissibility determination based upon later actions or statements made by the child. To the contrary, the western district of our Court observed in *Sprinkle,* "We were unable to find any cases considering admission of statements under section 491.075 that discussed evidence other than that adduced at the hearing, and we believe the only evidence to be considered is that adduced at the hearing." 122 S.W.3d at 661. This observation is consistent with the express language used in section 491.075.1(1), that the out-of-court statements are admissible if "[t]he court finds, *in a hearing conducted outside the presence of the jury* that the time, content and circumstances of the statement provide sufficient indicia of reliability[.]" Section 491.075.1(1) (emphasis added). Any requirement for the trial court to reconsider its previous section 491.075 admissibility determination based upon later actions or statements made by the child, as urged by Defendant, would be detrimental to the child involved. It would only serve to motivate those adults in the child's life who perceived they lost the admissibility ruling after the Chapter 491 hearing to exert pressure upon the child to thereafter change his or her trial testimony.

"Out-of-court statements by a child under the age of twelve admitted under the provisions of § 491.075 are considered sub-

stantive evidence of the truth of the matter asserted." *State v. Benwire,* 98 S.W.3d 618, 623 (Mo.App.2003) (citing section 491.075.1). "Such statements, and any inferences that may be drawn from those statements, 'may alone constitute substantial evidence of an element of the offense charged.'" *Benwire,* 98 S.W.3d at 623 (quoting *State v. Goad,* 926 S.W.2d 152, 156 (Mo.App.1996)). Once such statements are properly admitted according to the procedure in section 491.075, "admissibility is not the issue, but rather whether the trier of fact believes the evidence." *Benwire,* 98 S.W.3d at 623.

Inconsistencies and conflicts in testimony go to the credibility of the witness, not the admissibility of the testimony, and are left to the jury to resolve. *Sprinkle,* 122 S.W.3d at 664. Because young children are less articulate and understandably can become confused in a courtroom setting, a jury may still reasonably believe the veracity of a child's testimony even in cases when there are memory lapses, *State v. Perdue,* 317 S.W.3d 645, 651 (Mo.App.2010), and inconsistencies or contradictions in the child's testimony, *State v. Mattic,* 84 S.W.3d 161, 169 (Mo.App.2002). "Inconsistencies or contradictions in statements by a young child relating a sexual experience do not, by themselves, deprive the testimony of all probative force." *Id.* The jury is free to believe all, part, or none of the testimony at trial. *State v. Hawkins,* 328 S.W.3d 799, 811 (Mo.App.2010). Point I is denied.

### Conviction Supported by Sufficient Evidence

In his second point relied on, Defendant contends that the trial court erred in overruling Defendant's motion for judgment of acquittal at the close of all of the evidence, alleging that the State did not

prove beyond a reasonable doubt that Defendant digitally penetrated Victim's vagina, "*as required in the verdict director.*" (Emphasis added). Defendant claims that Victim "testified only that [Defendant's] finger touched her and she never claimed that he penetrated her."

Because Defendant's challenge in his motion for judgment of acquittal at the close of all of the evidence occurred before the jury was instructed, we evaluate Defendant's second point on the basis of whether there was sufficient evidence to submit the case against Defendant to the jury without regard for the effect of the subsequent verdict director. *See State v. Jones,* 296 S.W.3d 506, 509 (Mo.App.2009).

 A challenge to the sufficiency of the evidence challenges the trial court's ruling on the motion for judgment of acquittal prior to submission of the case to the jury; therefore, the issue "arises *before the case is put to the jury* and is really an issue of whether the case should have been submitted to the jury." *State v. Beggs,* 186 S.W.3d 306, 312 (Mo.App.2005) (emphasis added). "Therefore, any guilty verdict subsequently rendered by the jury is *wholly irrelevant* to the question of whether the case was sufficient to go to the jury at all." *State v. O'Brien,* 857 S.W.2d 212, 215 (Mo. banc 1993) (emphasis added). In *O'Brien,* our supreme court went on to explain:

> The Court's review is limited to determining whether the evidence is sufficient to persuade any reasonable juror as to each of the elements of the crime, beyond a reasonable doubt. To ensure that the reviewing court does not engage in futile attempts to weigh the evidence or judge the witnesses' credibility, courts employ "a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution." Thus, ev-

idence that supports a finding of guilt is taken as true and all logical inferences that support a finding of guilt and that may reasonably be drawn from the evidence are indulged. Conversely, the evidence and any inferences to be drawn therefrom that do not support a finding of guilt are ignored.

*Id.* at 215–16 (citation omitted); *see Beggs,* 186 S.W.3d at 313.

 "[S]ufficient evidence is that from which the trier of fact could reasonably find the issue in conformity with the verdict." *State v. Paulson,* 220 S.W.3d 828, 832 (Mo.App.2007). "The State may prove its case by presenting either direct or circumstantial evidence connecting the defendant to each element of the crime." *Jones,* 296 S.W.3d at 509. Upon appellate review, "[c]ircumstantial evidence is given the same weight as direct evidence and the jury is free to make reasonable inferences from the evidence presented." *Id.*

Section 566.062 provides:

1. A person commits the crime of statutory sodomy in the first degree if he has deviate sexual intercourse with another person who is less than fourteen years old.

2. Statutory sodomy in the first degree or an attempt to commit statutory sodomy in the first degree is a felony for which the authorized term of imprisonment is life imprisonment or a term of years not less than five years, unless in the course thereof the actor inflicts serious physical injury or any person, displays a deadly weapon or dangerous instrument in a threatening manner, subjects the victim to sexual intercourse or deviate sexual intercourse with more than one person, or the victim is less than twelve years of age, in which case the authorized term of imprisonment is

life imprisonment or a term of years not less than ten years.

The State charged that Defendant "committed the felony of statutory sodomy in the first degree, ... in that on or about August 15, 2009, through September 15, 2009, ... the defendant had deviate sexual intercourse with [Victim], who was then less than twelve years old."

Section 566.010, RSMo Cum.Supp.2006, defines "deviate sexual intercourse" as:

any act involving the genitals of one person and the hand, mouth, tongue, or anus of another person or a sexual act involving the penetration, however slight, of the male or female sex organ or the anus by a finger, instrument or object done for the purpose of arousing or gratifying the sexual desire of any person or for the purpose of terrorizing the victim[.]

Defendant argues, "In this case, the evidence does not establish that there was any penetration of the vagina." Defendant contends that Mother "only testified that [Victim] told her that 'Daddy Dallas had used his fingers on her pee-pee[ ]' " and Victim never mentioned penetration during the CAC interview with Weaver. Defendant essentially argues that this Court should view the evidence favorably to him, which we cannot do. *See O'Brien*, 857 S.W.2d at 215–16.

The evidence favorable to the jury's verdict included the following. During the CAC interview, Victim stated that she did not "want him to stick his whole finger in mine[,]" and that Defendant "poked" her in her "pee-pee." Cindy Tull, who performed a SAFE exam in November 2009, testified that Victim had "venereal warts on the anus and labia." She opined that genital warts "are predominantly sexually transmitted[,]" and while it is possible they can be transmitted in other ways, it is not probable. Dr. Lisa Powell testified that when she examined Victim, she had external vulvar warts. Dr. David Redfern testified that a large genital wart was detected on Victim's hymen and that the genital warts were predominantly around the rectum, anus, opening of the vagina, and hymen. He explained that HPV is most usually transmitted via "skin-to-skin contact." Dr. Timothy Fursa testified that "the contraction of genital warts oftentimes comes through genital-to-genital touching or touching of the genitalia." There was also testimony that Victim had recurring urinary tract infections. Dr. Gabrielle Curtis testified that, although there are many ways a child can get urinary tract infections, digital penetration of the vagina can cause urinary tract infections.

Viewing this evidence and inferences that may be derived therefrom in a light favorable to the jury's verdict, as we must, the evidence was sufficient for a reasonable juror to find Defendant guilty of deviate sexual intercourse with a child less than twelve years old. The trial court did not err in submitting the offense to the jury and denying Defendant's motion for acquittal. Point II is denied.

### No Juror Nondisclosure or Misconduct Proven

■ In his third point relied on, Defendant alleges the following:

The trial court abused its discretion in denying [Defendant's] motion for a new trial based on his claimed discovery that juror G.H. posted a public comment that she had sat on [Defendant's] jury and was an advocate for children, after having remained silent when asked if she would be more likely to convict because abuse of a child was involved; so that trial counsel had no knowledge of the omission until after trial; because this

misconduct deprived [Defendant] of his right to intelligently exercise a challenge for cause or a preemptory challenge against GH, and the trial court's ruling denied [Defendant's] rights to a trial by a fair and impartial jury, a fair trial, and due process of law, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 18(a) of the Missouri Constitution.

Defendant claims that defense counsel asked the venire panel during voir dire if anyone "would have a bias because the prosecution involved an offense against a child." Defendant cites to a transcript reference, where the defense counsel advised the panel that the charges against Defendant alleged that he committed statutory rape in the first degree and statutory sodomy in the first degree "and that it involved [Victim], who was almost three years old at the time." Counsel then asked the panel, "The mere fact that those are the allegations, would that make you more likely or less likely automatically to say [Defendant] is guilty or innocent?" One venire person stated, "Probably make me more likely[,]" and several other panel members raised their hands and agreed. During selection, all of those venire persons who indicated they would likely convict on that information alone were stricken and released from serving on the jury.

In his motion for new trial, Defendant alleged that "after the verdict, juror GH went public with statements that she 'has always been an advocate for children.'" Defendant argued, "By definition, an advocate is one who has an agenda to further their beliefs. As such, they cannot be fair and unbiased." Defendant further alleged that G.H. "was not qualified to serve as a venire person due to her beliefs and position of being an advocate for children."

On the date of sentencing, the trial court took up Defendant's motion for new trial. In support, Defendant's counsel argued:

After the trial KY3 publicized the results on their—there was a public forum held in which people can post comments and post things. One of the jurors stated that she was on the jury, that she was an advocate for children, and that would make her unsuitable for the—for—to sit in the jury. She did not answer those questions. Those questions were asked of the entire jury panel. She neglected to answer them. She said she could set aside her bias, when, clearly, she could not because the term "advocate" clearly means that you have a position. It's the third paragraph down on the second page, Your Honor, if you were looking for it. That she could not—she could not be fair. She was not qualified to sit on this jury because she had biases. She withheld those biases from the Court and, therefore, engaged in juror misconduct. . . .

The trial court overruled Defendant's motion for new trial.

 "The decision as to whether or not a juror intentionally concealed information during voir dire must be left to the trial court's discretion unless the appellate court is able to conclude from the record that an abuse of discretion unmistakably occurred." *State v. Martin,* 755 S.W.2d 337, 339 (Mo.App.1988). "When asserting juror misconduct, the defendant bears the initial burden of demonstrating that the conduct actually occurred." *State v. Miller,* 250 S.W.3d 736, 743 (Mo.App.2008). "When deciding whether to grant a new trial on the basis of juror nondisclosure, the trial court must first determine whether a nondisclosure actually occurred[.]" *Id.* "[N]on-disclosure occurs when the juror reasonably can 'comprehend the information solicited by the question asked.'"

*State v. Johnson,* 284 S.W.3d 561, 569 (Mo. banc 2009) (quoting *State v. Mayes,* 63 S.W.3d 615, 625 (Mo. banc 2001)). "A response is reasonable based on the language and context, and the question's clarity is subject to de novo review." *Johnson,* 284 S.W.3d at 569.

Next, "it must be determined whether the non-disclosure is intentional or unintentional." *Id.* "Unintentional nondisclosure involves an insignificant or remote experience, misunderstanding the question, or disconnected information." *Id.* at 569–70. "If unintentional, a new trial is not warranted unless the party can show the nondisclosure may have influenced the verdict[.]" *Miller,* 250 S.W.3d at 743. " 'Intentional nondisclosure occurs: (1) where there exists no reasonable inability to comprehend the information solicited by the question asked of the prospective juror, and (2) where it develops that the prospective juror actually remembers the experience or that it was of such significance that his purported forgetfulness is unreasonable.' " *Id.* (quoting *Williams by Wilford v. Barnes Hosp.,* 736 S.W.2d 33, 36 (Mo. banc 1987)). "[P]rejudice will normally be presumed if the nondisclosure was intentional." *Miller,* 250 S.W.3d at 743. "[T]he determination of whether nondisclosure was intentional or unintentional is within the sound discretion of the trial court. *State v. Fuller,* 837 S.W.2d 304, 308 (Mo.App.1992).

Here, Defendant argues,

The nondisclosure was not about a matter that was trivial to her, insofar as she believed herself to be a children's advocate, and apparently felt strongly enough to post a comment about it, it is highly unlikely that her feelings were so insignificant that her nondisclosure was unreasonable. Appellant demonstrated that G.H.'s nondisclosure was intentional.

"To prove intentional juror concealment, a defendant must make that allegation in his motion for new trial and factually support it with an affidavit or testimony from the non-disclosing juror." *Miller,* 250 S.W.3d at 743. In his motion for new trial, Defendant did not allege intentional juror concealment or nondisclosure, nor did Defendant produce an affidavit or support his allegation with testimony from the alleged juror. This Court cannot even determine the identity of the juror from the record on appeal. Defendant proffered no evidence to the trial court supporting his claim.

Defendant concedes that counsel did not produce an affidavit but contends that the defense produced "the juror's statements that were posted online, and the state did not dispute them." However, the record shows that when defense counsel was arguing the merits of Defendant's post-trial motion and referring to the alleged statement, the prosecutor stated that the statement in question "may or *may not even be attributed to this juror*[.]" Later, before the trial court ruled, the prosecutor stated, "I think it's just as reasonable to believe that when asked if she could be fair to both sides, *assuming again this is the same person,* which is another assumption we'd have to make, her non-response is an indication that she could set aside feelings and be fair and unbiased." It is clear to this Court that the State disputed the authenticity of the online posting.

Furthermore, Defendant has not produced the statement allegedly posted online in the record before this Court. No exhibit was filed, nor do we find any such statement in the legal file. In addition, there is no evidence in the record that the person who allegedly posted the statement online actually served on Defendant's jury. Based on the record before this Court, Defendant has failed to demonstrate that

the conduct alleged to support Defendant's claim of nondisclosure or juror misconduct actually occurred. *See Miller,* 250 S.W.3d at 743 (defendant must demonstrate that the conduct actually occurred).

The trial court did not abuse its discretion in denying Defendant's motion for new trial based on an allegation of juror nondisclosure. Point III is denied.

### *No Plain Error in State's Closing Argument*

■■■ In his fourth and final point relied on, Defendant asserts the following:

The trial court plainly erred in not intervening when the prosecutor argued that [Victim] was referring to [Defendant] when she told Jones that "my daddy touched my privates[,]" and that the jury could make an "educated guess" that [Victim] was referring to sexual abuse when she told Jones that "my bubby's daddy hurt me[,]" because this misstated the evidence at trial and invited the jury to speculate and supply affirmative evidence where none existed, in violation of [Defendant's] rights to due process of law and to a fair trial, as guaranteed by the Fourteenth Amendment to the United States Constitution, and Article I, Section 10 of the Missouri Constitution, in that there was no evidence that [Victim] ever referred to [Defendant] as her "daddy," nor can hitting on the stomach be logically converted into sodomy by an "educated guess."

■■■ Because Defendant did not object to the prosecutor's statements, he failed to preserve this claim for appeal and now seeks plain error review. "Plain error review is used sparingly and is limited to those cases where there is a clear demonstration of manifest injustice or miscarriage of justice." *Wadlow,* 370 S.W.3d at 318. "Claims of plain error are reviewed 'under a two-prong standard.'" *Id.* (quot-ing *State v. Roper,* 136 S.W.3d 891, 900 (Mo.App.2004)). First, we determine whether there is, indeed, plain error. *Wadlow,* 370 S.W.3d at 318. Plain error is defined as error that is evident, obvious, and clear. *Id.* If we are satisfied that the first prong is met, we next consider whether manifest injustice or miscarriage of justice has in fact occurred as a result of the error. *Id.* Here, Defendant bears the burden of proving both prongs, and failure to prove either prong defeats his claim.

■■■ Appellate review on assertions of plain error as to closing argument "mandates reversal only if the error results in manifest injustice." *State v. White,* 247 S.W.3d 557, 563 (Mo.App.2007). Relief is rarely granted on such claims "because, in the absence of objection and request for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention." *Id.* "Because trial strategy looms as an important consideration in any trial, assertions of plain error concerning matters contained in closing argument are generally denied without explication." *Id.*

The prosecutor here argued:

In March—in somewhere right—I forgot to add in, according to testimony, after that hotline by Dr. Fursa and the CAC by Matt Brown, [Mother] calls Corey [Victim's biological father] and says, hey, would you like to come back in [Victim's] life and be a dad, because he hadn't come around. He just kind of left the picture, and he wasn't here at all. So, anyway, she starts seeing him at that point in time. So in March—and I just want you to know that, because I'm going to go into this statement. In March—on March 17, she tells Kelley, *my daddy touched my privates.* She reflects the statement back to [Victim],

and [Victim] says it was with his body. Now, remember, Corey hasn't been in her life very long, and even though mom says she refers to him as Daddy Dallas, the experts have said it's not unusual for a child to have several different names for one person. She—this defendant was her daddy from the time she was five months old until she was almost three years old. Well, now at this point this is when he's leaving her life. She's not having to see the defendant anymore. So this person that was daddy to her is now completely identified as Daddy Dallas.

In April of 2010, she makes another statement to Kelley Jones—my—Ms. Kelley, *my bubby's daddy hurt me.* Reflected the statement back to her, and [Victim] stated he hurt her face, on both—excuse me—on both cheeks and her belly. Okay. She says that. Because we're relying on statements of a four-year-old child, we're not ever going to know every single detail about what happened when she was over at the defendant's house. Could this be about the—the sexual abuse? Possibly, but we don't—we don't know that for certain. I mean, honestly, we don't. We can only kind of guess. And how do we do that? And not really guess. We're making an educated guess, and it's reasonable to think that she's talking about her daddy hurting her that way, because hindsight is 20/20. And once we get to where we are today and look back, a lot of things make sense that didn't make sense back when they happened.

(Emphasis added).

██ This argument contains no evident, obvious, and clear error. Rather, the prosecutor is merely arguing that, given the totality of the circumstances in evidence, the jury should draw a reasonable inference that Defendant was the person

Victim was referring to in her comments to Jones. "[B]oth the state and the defense are entitled to argue reasonable inferences from the evidence." *State v. Edwards*, 116 S.W.3d 511, 537 (Mo. banc 2003). While Defendant alleges that the prosecutor "misstated the evidence at trial," he does not identify any specific misstatement of direct evidence made by the prosecutor. He merely disagrees with the inference the prosecutor is asking the jury to make and then characterizes that inference as a misstatement of evidence. The inference as argued by the prosecutor, however, was reasonably supported by the direct evidence recited by the prosecutor.

Having found no evident, obvious, and clear error, the first prong of Defendant's plain error claim fails, and our inquiry ends. *State v. Smith*, 293 S.W.3d 149, 151 (Mo.App.2009). Defendant's fourth point is denied.

### Decision

The trial court's judgment convicting Defendant is affirmed.

JEFFREY W. BATES, P.J., and MARY W. SHEFFIELD, J., concur.